Jason M. Ingber (SBN 318323)
jingber@zlk.com
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, CA 90010
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Eleanor Davis*
edavis@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE MENDOZA and MATTHEW HORAN, on Behalf of Themselves and All Others Similarly Situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| U.S. NEWS & WORLD REPORT, L.P. | **<u>JURY TRIAL DEMANDED</u>** |
| Defendant. | |

CLASS ACTION COMPLAINT

Plaintiffs Frankie Mendoza and Matthew Horan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant U.S. News & World Report, L.P. (the "Defendant" or "U.S. News"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of similarly situated individuals to address Defendant's unauthorized disclosure of their private data, including personally identifiable information ("PII"), to unauthorized third parties.

2. U.S. News operates https://usnews.com/ (the "Website"), a high-traffic, consumer-facing digital platform that publishes news, rankings, and informational content across a wide range of subject areas, including health, education, finance, travel, and consumer products. The Website is designed to drive user engagement through a combination of editorial content and interactive tools, including rankings pages (e.g., colleges, hospitals, and products), comparison features, filters, quizzes, and personalized recommendation modules.

3. The health-focused section of the Website is dedicated to publishing detailed information concerning medical conditions, symptoms, treatments, healthcare providers, and wellness topics, covering a wide range of physical and mental health issues through condition-specific pages, treatment guides, medication information, and provider directories. The Website allows users to explore these sensitive topics through structured navigation and interactive tools, allowing them to browse by condition, search for symptoms, compare treatment options, and access rankings of hospitals, specialists, and healthcare services. Users may further refine results based on location, specialty, condition, and other personal criteria, tailoring the experience to their individual health concerns and circumstances.

- 1 -

CLASS ACTION COMPLAINT

4.      Embedded on the Website is tracking technology from third parties, including Google and ScorecardResearch (collectively, the "Tracking Entities"), designed to intercept users' Website communications, including their health-related browsing activity, and disclose those interceptions to the Tracking Entities without users' knowledge or consent (the "Tracking Tools").

5.      The Tracking Tools collect a broad range of sensitive user data, including detailed behavioral data and website interactions — such as search field inputs, clicks on links and articles, and webpages viewed. Here, this results in the capturing of users' medical conditions, treatments, and health interests. Furthermore, the Tracking Tools capture personal and persistent identifiers — including cookies and approximate geolocation data derived from IP addresses — that enable the Tracking Entities to identify and track individual users across sessions and across websites (collectively, "Sensitive Information"). Each data point collected is aggregated by the Tracking Entities into comprehensive marketing profiles used to facilitate targeted advertising purchases by third-party advertisers seeking to reach specific users.

6.      The Tracking Tools are active on the Website the moment a user arrives on the Website — capturing, and transmitting to the Tracking Entities, users' Sensitive Information before: (i) users have encountered any terms of use or privacy policy; (ii) users have had any opportunity to consent; and, (iii) even become aware of U.S. News's data handling practices. By the time a user might encounter a privacy policy or terms of use, the Tracking Entities have already captured a user's Sensitive Information. For users who never create an account with the Website, Defendant likely never puts users on notice.

7.      Plaintiffs are users of the Website who had their Sensitive Information disclosed to the Tracking Entities without their consent.

8.      Accordingly, Plaintiffs have been harmed by Defendant's procurement of Tracking Entities to track and use Website users' Sensitive Information for marketing purposes, which constitutes unlawful wiretapping and an invasion of Plaintiffs' privacy.

- 2 -

CLASS ACTION COMPLAINT

9.     In addition to the monetary and statutory damages applicable to Plaintiffs' Claims, Plaintiffs seek injunctive relief requiring U.S. News to immediately (i) remove the Tracking Tools from the Website, (ii) adjust the operation of the tracking tools on the Website to prevent the sharing of legally protected information, or (iii) add appropriate and conspicuous disclosures about the nature of its advertising practices, and obtain appropriate consent.

## **PARTIES**

10.     Plaintiff Matthew Horan is, and at all relevant times was, a resident of the State of North Carolina. Plaintiff Horan visited the Website in or about March 2026 and has visited the Website on multiple occasions. Plaintiff Horan visited the Website, including in or about November 2024, to research medical providers and health-related information. Plaintiff Horan does not maintain an account with the Website.

11.     Plaintiff Frankie Mendoza is, and at all relevant times was, a resident of the State of California. Plaintiff Mendoza visited the Website on multiple occasions, including in or about January 2026, during which he accessed the Website to research information concerning a newly identified disease and related public health developments. Plaintiff Mendoza does not maintain an account with the Website. However, Plaintiff Mendoza subscribed to U.S. News's email newsletter, thereby providing Defendant with his personal contact information, including his email address.

12.     Defendant U.S. News & World Report, L.P. is in the business of publishing and distributing news, rankings, and informational content to consumers through its online platform, including content relating to healthcare providers, medical conditions, and health-related services. Defendant operates the U.S. News website and its health-focused subdomain, U.S. News Health, which provides users with rankings, provider information, and other health-related resources. Defendant is headquartered in Washington, D.C.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because: (1) The amount in controversy exceeds $5 million, exclusive of interest and costs; (2) there are more than 100 putative members of the Class; and (3) a significant portion of the Class are citizens of a different State than Defendant.

14.    This Court has personal jurisdiction over Defendant because it conducts substantial business in this District, including by operating the Website, which is accessible to and used by consumers in this District. Defendant also maintains substantial business operations connected to this District and derives revenue from its operation and management of the Website, including through advertising, retail partnerships, and related commercial activity.

15.    Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

16.    Plaintiff Horan actively engaged with the Website's features to research healthcare providers, including a physician to whom he had recently been assigned following a change in his medical care. In doing so, Plaintiff Horan navigated to and reviewed pages containing information about specific doctors, healthcare services, and related medical content. Plaintiff Horan clicked on links, accessed provider profiles, and reviewed health-related articles and materials concerning medical care and treatment options. Plaintiff Horan reasonably expected that his browsing information regarding healthcare providers and medical topics would remain anonymous, and between himself

CLASS ACTION COMPLAINT

and the Website. Accordingly, Horan's Sensitive Information was disclosed to the Tracking Entities.

17. During his visits to the Website, Plaintiff Mendoza navigated to and reviewed health-related articles and content concerning emerging medical diseases. As with Plaintiff Horan, Plaintiff Mendoza reasonably expected that his browsing information regarding medical topics would remain anonymous and would be kept between himself and the Website. Accordingly, Mendoza's Sensitive Information was disclosed to the Tracking Entities.

## How Websites Function

18. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[1]

19. An IP address is "a unique address that identifies a device on the Internet or a local network."[2] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[3]

20. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an

---

[1] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).
[2] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).
[3] *Id.*

CLASS ACTION COMPLAINT

HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[4]

21.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.[5]

22.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:

23.    Website owners or web developers write and manage the URLs for their websites.

24.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[7]

25.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[4] *Id.*

[5]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

[6] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).

[7] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited May 4, 2026).

- 6 -



*Figure 1 – Request URL of sample webpage, encoded for transmission (compare with decoded URL in Figure 2)*



*Figure 2 – Decoded, parsed data from Request URL in Figure 1, showing easy-to-read parameters and metadata*

CLASS ACTION COMPLAINT

26.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[8] and rendered into a visual display according to the instructions of the HTML code.[9] This is the visible, and usually interactable, website that most people think of.

27.     To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[10]

28.     Such complex tasks include code used to monitor and report user activity.

29.     In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

30.     Unbeknownst to users, as they browse the Website, the Tracking Tools, including third and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

**Defendant Knowingly Procured and Embedded the Tracking Tools on its Website**

31.     Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is

---

[8] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[9] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[10] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

- 8 -

performed pursuant to commercial agreements between Defendant and the Tracking Entities.

32. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as users' Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

33. Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance:

> Cookies, pixel tags, and other tracking technologies are placed or loaded on your computer or mobile device to manage and optimize the U.S. News Services, including to improve the design, delivery, and content of the U.S. News Services, to enable us to personalize your user experience, including content and advertisements, and to recognize you across devices. Cookies identify when you log into or use the U.S. News Services on multiple devices or browsers, and they help deliver and measure the effectiveness of advertisements, calculate unique site visitors, track usage throughout our site, and make the login process more convenient for the U.S. News Services that use logins.

34. Defendant further explains that advertisers, service providers, and other third parties may independently use cookies, pixel tags, and similar tracking technologies to recognize users' devices and collect information about their interactions with the U.S. News Services and other websites. These third parties may use such data to track user activity, measure engagement, and deliver targeted advertising. Defendant also acknowledges that these tracking technologies may be used to build profiles of users' interests based on their browsing activity and that such information may be shared with Defendant. Defendant does not meaningfully limit or control the use of these third-party

- 9 -

CLASS ACTION COMPLAINT

tracking technologies once deployed, resulting in the transmission of users' Sensitive Information to third-party Tracking Entities without users' knowledge or contemporaneous consent.

### The Tracking Tools Read Plaintiffs' Sensitive Information and Track Them Across the Internet

35. Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers. Defendant configured the Website to place both first- and third-party cookies on Plaintiffs' browsers when they accessed the Website, allowing the Tracking Entities to identify and monitor Plaintiffs' activity.

36. The Tracking Tools operate invisibly, intercepting Plaintiffs' Sensitive Information as it arrives at or is sent from their devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities. This process is entirely surreptitious — users are given no indication that their interactions are being captured and transmitted in real time.

37. Central to this process are cookies — small text files sent by a website's server to a user's browser and stored locally on their device. Cookies contain unique identifiers that enable websites and third parties to recognize and differentiate individual users, and are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to record everything a user views, clicks, types, or hovers over during a session.

38. First-party cookies were placed directly on Plaintiffs' devices by Defendant's Website and are used to recognize Plaintiffs across repeated visits and track their on-site activity. Third-party cookies, by contrast, are placed by external domains — such as google.com and other advertising or analytics platforms. When Plaintiffs' browsers load webpages containing embedded third-party resources, the Tracking Entities' scripts determine whether their cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies enable the Tracking

CLASS ACTION COMPLAINT

Entities to recognize and track Plaintiffs not only on the Website, but across entirely different websites and multiple browsing sessions.

39.     The Tracking Tools also collect information tied to specific user interactions — or "events" — defined and configured by Defendant, such as loading a webpage or adding a product to a shopping cart. Defendant further controls the scope of data collected by adding parameters to these events. Parameters are strings of text appended to a URL in key-value pairs formatted as "key=value": the "key" identifies what is being tracked (e.g., "ev" for event type), and the "value" captures the specific data associated with that interaction (e.g., "AddToCart"). By adjusting these parameters, Defendant determines precisely how much data is collected and at what level of granularity.



*Figure 3 - Diagram of a URL displaying how parameters function[11]*

**I.     Google's Analytics Suite**

40.     The Website uses Google's Tracking Tools. Google's Tracking Tools tracked and intercepted Plaintiffs' webpage views pertaining to health-related topics and their searches, including Plaintiff Horan's search for his medical provider and Plaintiff Mendoza's search for information about viruses.

---

[11] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited May 7, 2026).

**A.   Google Analytics ("GA")**

41.   GA collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call-to-action performance, table-of-contents clicks, and other customizable events.[12]

42.   GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[13] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[14]

43.   GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendant.

44.   Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views and searches to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[12] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 7, 2026).

[13] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 7, 2026).

[14] *Id.*

- 12 -

CLASS ACTION COMPLAINT



*Figure 4 – A sample webpage on the Website*

CLASS ACTION COMPLAINT



*Figure 5 – GA capturing user searches on the Website*

CLASS ACTION COMPLAINT



*Figure 6 – The contents captured by GA when it captures users' searches on the Website*

CLASS ACTION COMPLAINT

*Figure 7 – Cookies placed and received by GA on the Website*

45.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

46.    Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[15] Google uses data on how users interact with websites to train its algorithms to provide more accurate and relevant search results.[16] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[17]

**B.    Google DoubleClick**

47.    Without their knowledge or consent, Plaintiffs had their Sensitive Information, including searches for doctors and viruses, respectively, intercepted and transmitted to Google through DoubleClick's ad exchange system, which the Defendant used to monetize users' private health information through targeted advertising.

48.    DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to connect with other website owners to buy ad space within other websites and allows website owners to track the performance of their ads

---

[15] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan. 7, 2026).

[16] *Id.*

[17] *Id.*

CLASS ACTION COMPLAINT

across websites.[18] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and website owners that are looking to purchase ad space on a website.[19]

49. DoubleClick works in a similar way to Google Ads and Google AdSense in that it allows companies to buy impressions through the 0 Ad Exchange.[20] A DoubleClick account requires the use of a corresponding Google AdSense account.[21] DoubleClick is typically used for large-scale advertising as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers of over 100 Ad Exchanges.[22]

50. The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[23] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick, where it is reviewed and approved;[24] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[25]

---

[18] Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP (Dec. 10, 2022) https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited June 2, 2026).

[19] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT, https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited May 4, 2026).

[20] Kelly Duval and Sofie Segercrantz, *Google Ads metrics: The KPIs that matter most and how to improve them*, SUPERMETRICS (July 23, 2024) https://supermetrics.com/blog/double-click-overview (last visited June 2, 2026).

[21] Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon – How Does DoubleClick DFP Work?*, ADPUSHUP (Dec. 10, 2022) (last visited June 2, 2026).

[22] Kelly Duval and Sofie Segercrantz, *Google Ads metrics: The KPIs that matter most and how to improve them*, SUPERMETRICS (July 23, 2024) (last visited June 2, 2026).

[23] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (last visited June 2, 2026).

[24] *Support: Creating ads on your website with Google DoubleClick for Publishers*, HOCKEYTECH, https://support.hockeytech.com/portal/en/kb/articles/creating-ads-on-your-website-with-google-doubleclick-for-publishers (last visited June 2, 2023).

[25] Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon – How Does DoubleClick DFP Work?*, ADPUSHUP (Dec. 10, 2022) (last visited June 2, 2026).

- 17 -

CLASS ACTION COMPLAINT

51.    Defendant sends Website users' Sensitive Information to Google via the URL ad.doubleclick.net as depicted below:



*Figure 8 – Google DoubleClick tracking a user landing on the page of the Website.*

CLASS ACTION COMPLAINT



*Figure 9 – Payload of Google DoubleClick tracking a user landing on the product page of the Website*

*Figure 10 – Cookies placed by and received by Google DoubleClick on the Website*

52.     Google Ad Manager has various fee structures that can be utilized, including a percentage of spend plus a flat monthly fee, a flat monthly fee or percentage of spend, whichever is higher, or a flat fee percentage based on the amount you spend every

CLASS ACTION COMPLAINT

month.[26] Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

53. As explained above, AdSense ads are based on the Google Ads bidding process. In connection with AdSense searches, publishers, such as Defendant, receive 51 percent of the revenue recognized by Google.

**II.  ScorecardResearch**

54. Plaintiffs' Sensitive Information, such as medical search terms, including Horan's searches for doctors and Plaintiff Mendoza's searches for viruses, was intercepted and transmitted to Google via ScorecardResearch without their consent, enabling Google and Defendant to monetize that private health information through a targeted advertising bidding system.

55. ScorecardResearch describes itself as "a leading global market research [company] that studies and reports on Internet trends and behavior."[27] ScorecardResearch states that they "conduct[] research by collecting Internet web browsing data and then use[] that data to help show how people use the Internet, what they like about it, and what they don't."[28] Scorecard Research offers two ways to collect data for website operators and others wishing to utilize their technology: (1) surveys, and (2) web tagging using the ScorecardResearch web beacons.[29]

56. The ScorecardResearch web beacons are offered to website operators that wish to take part in the company's market research. A company that elects to take part in such market research would place a ScorecardResearch web beacon into its website code, which allows comScore to observe "browser-level behaviour.'" The ScorecardResearch

---

[26] *How Much Does Google Ads Management Cost?*, JOE BALESTRINO (Feb 17, 2023) https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited June 2, 2026).

[27] *Welcome*, SCORECARD RESEARCH, https://www.scorecardresearch.com/ (last visited June 3, 2026).

[28] *Id.*

[29] *Id.*

CLASS ACTION COMPLAINT

Privacy Policy states that its web beacons and tags will collect information including: (1) online identifiers (e.g., cookie ID, device ID, IP address, etc.); (2) geolocation (inferred from the IP address; (3 Internet or other electronic network activity including information about your browsing history, operating system, browser type, website preferences, your use of the website or application on which the Tags have been implemented (e.g., time accessed, duration of visit, etc.). The data collected by ScorecardResearch is stored "for as long as is reasonably necessary for the purposes listed above or as required by applicable local law." According to comScore, such data is shared "with (i) our customers, including Google, which include media companies, brands, public relations companies, advertising networks, data analytics providers, distribution partners, social networks, marketing and advertising agencies, and (ii) joint industry committees ("JICs") involved in media audience measurement and research in a particular region, or parties engaged by these JICs. Such parties may combine your data with other data which they have at their disposal."

57.    ScorecardResearch intercepts search terms on the Website as depicted below:

- 21 -

CLASS ACTION COMPLAINT

*Figure 11 – Scorecard intercepting users' searches on the Website*

CLASS ACTION COMPLAINT



*Figure 12 – Content captured when Scorecard intercepts users' searches on the Website*



*Figure 13 – Cookies placed and received by Scorecard on the Website*

58. When websites utilize ScorecardResearch web beacons, ScorecardResearch derives a principal benefit in the form of revenue earned through the

- 23 -

commercialization and sale of the data collected through those beacons in its product offerings. As noted in its Privacy Policy, ScorecardResearch: "use[s] the collected information to prepare analyses and reports regarding digital consumption behavior that we share with other businesses and organizations which are our customers. These reports help our customers meet their business goals by providing them with a better understanding of digital consumption behavior, trends, and consumer preferences."[30] Scorecard further states that the information obtained is also used by comScore, "whose data are routinely cited by major media outlets such as The New York Times®, The Wall Street Journal®, and CNN®. The data are extensively relied upon by some of the world's largest media companies, advertisers, film studios, and its strategic partners include the most important players in the TV and digital media and advertising ecosystem."[31]

59.    ScorecardResearch engages in data tracking and sharing for the purpose of improving its products and services and assisting in the operation of its business. Through the continued collection and use of data obtained from website users, ComScore and ScorecardResearch are able to strengthen and expand their product offerings. Those enhanced offerings permit further investment in technologies designed to track user behavior and to commercialize that information through sales to business partners.

60.    The information collected from the Website through ScorecardResearch tracking technologies, and later sold, is important to both ScorecardResearch and comScore. It allows each to offer products and information to their clients and to derive revenue from those offerings.

61.    ScorecardResearch tracking technologies provide Defendant with the ability to measure user behavior on and across the Website, identify behavioral trends, and use that information to more effectively deliver targeted advertising. As stated in the ScorecardResearch Privacy Policy, its web tags and cookies assist websites in counting users who have visited and viewed a webpage or portions of a webpage. More effective

---

[30] *Id.*
[31] *Id.*

CLASS ACTION COMPLAINT

consumer targeting on the Website increases the Operator Defendant's revenues. Under standard online marketing practices, the Operator Defendant receives a share of advertising revenue generated from ad conversions.

**Plaintiffs Did Not Consent to Defendant's Sharing of Their Website Activity**

62. Plaintiffs were unaware of the tracking tools intercepting their Sensitive Information.

63. Plaintiffs reasonably believed that their communications and interactions with the Website were made in confidence and that they would not be shared with the Tracking Entities.

64. U.S. News's privacy policy states that when processing sensitive personal data, it "will rely on your explicit consent to do so as required by law." However, no such explicit consent was requested of or obtained from Plaintiffs prior to the collection and transmission of their Sensitive Information to Google Analytics and ScorecardResearch.

65. Google's own terms and documentation governing the use of Google Analytics caution website operators against sending personally identifiable information or sensitive user data through the Analytics platform without appropriate disclosure and user consent.

66. In contravention of these guidelines and its own stated privacy commitments, Defendant collected Plaintiffs' Sensitive Information.

67. Plaintiffs were not given adequate notice of the use of Tracking Tools on the Website. As a result, Plaintiffs did not and could not provide meaningful consent to the collection and sharing of their Sensitive Information.

**TOLLING**

68. The statutes of limitations applicable to Plaintiffs' and the Classes' claims are tolled by Defendant's conduct and Plaintiffs' and Class members' delayed discovery of their claims.

69. As alleged above, Plaintiffs and Class members did not know and could not have known when they used the Website, Defendant was disclosing their Sensitive

- 25 -

CLASS ACTION COMPLAINT

Information to the Tracking Entities without their consent. Plaintiffs and members of the Classes could not have discovered Defendant's unlawful conduct with reasonable diligence, given the highly technical nature of how the Tracking Tools operate.

70. Defendant had exclusive and superior knowledge that the Tracking Tools incorporated on its Website would disclose Plaintiffs' and Class Members' Sensitive Information to the Tracking Entities.

71. The earliest Plaintiffs and Class Members could have known about U.S. News's conduct in connection with their investigation and the work done on their behalf in preparation for filing this Complaint.

**CLASS ACTION ALLEGATIONS**

72. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Classes (collectively "the Class").

73. Plaintiffs bring this class action individually and on behalf of the following Class:

> All natural persons in the United States who visited and interacted with Defendant's Website during the applicable limitations period, whose electronic communications were intercepted, disclosed, or shared via the Tracking Tools (the "Nationwide Class").

74. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All natural persons who visited and interacted with the Defendant's Website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared via the Tracking Tools (the "California Subclass").

75. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its

- 26 -

CLASS ACTION COMPLAINT

heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

76. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

77. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant.

78. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class members, include but are not limited to the following:

79. Whether Defendant shared the Class Members' information with the Tracking Entities or other third parties;

80. Whether Defendant obtained effective and informed consent to do so;

81. Whether Class Members are entitled to statutory penalties; and

82. Whether Class Members are entitled to injunctive relief.

83. TYPICALITY: As persons who visited Defendant's Website and whose Sensitive Information was shared via acts by Defendant, Plaintiffs are asserting claims that are typical of the Classes.

84. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

CLASS ACTION COMPLAINT

85.   SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510 et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

86.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein.

87.   Codified under 18 U.S.C. § 2510 et seq., the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

88.   The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

89.   The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

90.   The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

91.   The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in

- 28 -
CLASS ACTION COMPLAINT

whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

92.    Defendant is a person under the Wiretap Act.

93.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

94.    Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, health-related browsing activity, and other interactions with Website features.

95.    Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

96.    Within the relevant time period, Plaintiffs' electronic communications, including their Sensitive Information, with the Website were intercepted contemporaneously, at the moment of transmission, by the Tracking Tools and transmitted to the Tracking Entities without Plaintiffs' consent, for the unlawful purpose of disclosing Plaintiffs' health information and monetizing their Sensitive Information, including by combining it with data collected about Plaintiffs from across the internet for use in advertising, analytics, and marketing optimization.

97.    The interception occurred whenever Plaintiffs and Class Members interacted with the Website, including when they navigated webpages and entered information into search features.

98.    Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website, and understood that doing so would result in the interception and transmission of Plaintiffs' and Class Members' Sensitive Information communications to the Tracking Entities.

- 29 -

CLASS ACTION COMPLAINT

99.    Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications, including their Sensitive Information.

100.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b.    that Defendant cease from using Plaintiffs' and Class Members' Sensitive Information for its own marketing and advertising purposes;

c.    that Defendant request the deletion of all information wrongfully transmitted to the Tracking Entities;

d.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

e.    reasonable attorneys' fees and costs.

### COUNT II
### INTRUSION UPON SECLUSION
**(On Behalf of Plaintiffs and the Nationwide Class)**

101.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein.

102.    Defendant intentionally intruded upon Plaintiffs' and Class Members' solitude or seclusion in that it effectively placed Tracking Entities in the middle of conversations, involving their Sensitive Information, including health-related information, to which it was not an authorized party.

103.    Defendant's participation in Tracking Entities' interception of Plaintiffs' and Class members' Sensitive Information was not authorized by Plaintiffs or Class Members.

- 30 -

CLASS ACTION COMPLAINT

104. Defendant's enablement of the Tracking Entities on its Website constitutes an intentional intrusion into Plaintiffs' and Class Members' internet communications and Sensitive Information — including their browsing activity and search entries — that would be highly offensive to a reasonable person, as it violates federal and state criminal and civil laws designed to protect individuals from the unauthorized disclosure of personal information that carries inherent monetary value.

105. Defendant's conduct amounts to the clandestine monitoring, wiretapping, and recording of Plaintiffs' and Class Members' sensitive health information — conduct that is independently highly offensive to a reasonable person.

106. The Tracking Entities, including Google and ScorecardResearch, used this intercepted information to build sprawling advertising profiles for Plaintiffs and the Class Members. These profiles are used to target Plaintiffs and the Class Members with personalized ads based on their personal and Sensitive Information.

107. Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person is handling sensitive health-related information. Plaintiffs and Class Members have been damaged by Defendant's facilitation of the Tracking Entities' intrusion upon their seclusion and are entitled to reasonable compensation, including but not limited to disgorgement of profits related to the unlawful internet tracking.

- 31 -

CLASS ACTION COMPLAINT

## COUNT III
**VIOLATION OF THE CALIFORNIA
INVASION OF PRIVACY ACT
Cal. Penal Code § 631
(On Behalf of Plaintiff Mendoza and the California Subclass)**

108. Plaintiff Mendoza repeats the allegations contained in the foregoing paragraphs as if fully set forth therein.

109. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

110. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

111. Within the relevant time period, the Tracking Entities, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Mendoza and the California Subclass, contemporaneous with the communications transit through or passing over any wire, line or cable or with the

CLASS ACTION COMPLAINT

communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

112. Plaintiff Mendoza and the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiff Mendoza and the California Subclass)**

113. Plaintiff Mendoza repeats the allegations contained in the foregoing paragraphs as if fully set forth therein.

114. California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630 et seq.

115. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

116. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

117. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'"

- 33 -
CLASS ACTION COMPLAINT

118. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51(a).

119. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

120. Defendant did not obtain consent from Plaintiff Mendoza or the California Subclass before using pen register or trap and trace technology to identify users of its Website and has violated Section 638.51.

121. As a direct and proximate result of Defendant's conduct, Plaintiff Mendoza and the California Subclass suffered losses and were damaged in an amount to be determined at trial.

## COUNT V
### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Nationwide Class)**

122. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth therein.

123. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

124. It is unjust that Defendant retains those benefits under circumstances in which the Sensitive Information was collected and transmitted without valid consent.

125. Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the

- 34 -

CLASS ACTION COMPLAINT

Nationwide Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant.

126. There is no remedy at law that will address this harm, as monetary damages will not capture or account for the wrongful profit or benefit that Defendant received from exploiting Plaintiffs' and Class Members' Sensitive Information.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring U.S. News to immediately (i) remove the tracking tools from the Website or (ii) add, and obtain, the appropriate consent from Plaintiffs and users;

e. For damages in amounts to be determined by the Court and/or jury;

f. An award of statutory damages or penalties to the extent available;

g. For pre-judgment interest on all amounts awarded;

h. For an order of restitution and all other forms of monetary relief;

i. An award of all reasonable attorneys' fees and costs; and

j. Such other and further relief as the Court deems necessary and appropriate.

- 35 -

CLASS ACTION COMPLAINT

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

DATED: June 4, 2026                        Respectfully submitted,

Jason M. Ingber (SBN 318323)
jingber@zlk.com
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, CA 90010
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Eleanor Davis*
edavis@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT